# In the United States Court of Federal Claims

No. 16-45C
(Filed: May 15, 2019)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KIEWIT INFRASTRUCTURE WEST, CO.,**

        Plaintiff,

v.

**THE UNITED STATES,**

        Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

**DAMICH, Senior Judge.**

      This Contract Disputes Act ("CDA") action arises from the design-build fixed-price construction contract between Kiewit Infrastructure West, Co. ("Plaintiff" or "KIWC") and the United States ("Defendant") acting through the Western Federal Lands Highway Division ("WFLHD") of the United States Department of Transportation ("USDOT") for a project known as AK PFH 43(10), Deweyville Trailhead to Neck Lake Road, Contract No. DTFH70-12-C-0017 ("the project"). The project involved the realignment of approximately 11 miles of a preexisting single lane logging road into a two-lane paved road in the Tongass National Forest on Prince of Wales Island in Southeast Alaska. The project consisted of clearing and grubbing the worksite, and waste excavation and disposal, among other things.

      Plaintiff filed its complaint in this Court on January 11, 2016, seeking an equitable adjustment pursuant to the CDA, based on two counts. Count One of Plaintiff's complaint alleges that the Defendant constructively changed the terms of the contract. Count Two alleges that the site conditions materially differed from the conditions actually encountered, notwithstanding Plaintiff's reasonable site inspection conducted prior to the award of the contract. In light of this, Plaintiff did not include wetland mitigation costs related to the waste disposal areas in its bid. However, the waste disposal sites did in fact contain wetlands and Plaintiff was required to buy wetland mitigation credits. Therefore, Plaintiff requests that this Court award it an equitable adjustment in the amount of $490,387,40, together with interest and costs.

1

Defendant answered Plaintiff's complaint on May 5, 2016. Thereafter, discovery commenced and concluded on February 28, 2018. At the conclusion of discovery, the parties proposed a schedule for summary judgment briefing. The Court[1] adopted the briefing schedule and in accordance with the schedule, on May 11, 2018, Plaintiff filed its motion for summary judgment pursuant to Rule 56(c) of the Rules of the Court of Federal Claims ("RCFC ") ("Pl. Mot.").

Defendant timely responded on July 5, 2108, filing a partial motion to dismiss pursuant to RCFC 12(b)(1), response to Plaintiff's motion for summary judgment, and cross-motion for summary judgment pursuant to RCFC 56(c) ("Def. Mot."). For the first time, Defendant asserts that this Court lacks jurisdiction over Plaintiff's differing site condition claim. In support, Defendant argues that the Plaintiff failed to submit a certified claim to the Contracting Officer with regard to its differing site condition claim and, accordingly, the Contracting Officer never issued a final decision regarding this issue. If, however, this Court finds jurisdiction, Defendant argues that it is entitled to summary judgment over the differing site condition claim because the contract did not contain an affirmative representation regarding the presence of wetlands in the waste disposal areas of the project and the presence of wetlands in the waste disposal areas was reasonably foreseeable. Defendant further argues that it is entitled to summary judgment on Plaintiff's constructive change claim because the contract placed responsibility for the purchase of all wetland mitigation credits upon Plaintiff. Therefore, Plaintiff did not perform work beyond the contract requirements by paying for the mitigation credits regarding wetlands in the waste disposal areas.

The case was fully briefed on August 16, 2018. On December 4, 2018, pursuant to RCFC 40.1(c), the case was reassigned to the undersigned.

By order dated March 7, 2019, the Court ordered supplemental briefing on two issues raised in Defendant's briefs. Specifically, the Court ordered the parties to address: (1) whether the fact that the Plaintiff spent less on its purchase of wetland mitigation credits than the amount included in its bid affects Plaintiff's claim for relief; and (2) whether the fact that Kiewit expanded the waste disposal sites affects Plaintiff's cause of action.[2]

For the reasons set forth below, the Court **DENIES** Plaintiff's Motion for Summary Judgment. The Court further **DENIES** Defendant's Partial Motion to Dismiss and **GRANTS** Defendant's Cross-Motion for Summary Judgment.

I.  **Background and Relevant Statutes**

The project involved designing and reconstructing a road in the Tongass National Forest. Due to the fact that the project was a Federal project in a national forest, environmental statues were implicated. Specifically, the project implicated two separate and distinct statutes: the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, and section 404 of the Clean Water Act, 33 U.S.C. § 1344.

---

[1] The Honorable Margaret M. Sweeney, presiding.

[2] In light of this opinion, the Court need not address these issues.

### A.     The National Environmental Policy Act

Pursuant to NEPA, federal agencies are required to:

> incorporate environmental considerations in their planning and decision-making through a systematic interdisciplinary approach. Specifically, all federal agencies are to prepare detailed statements assessing the environmental impact of and alternatives to major federal actions significantly affecting the environment. These statements are commonly referred to as Environmental Impact Statements (EIS) and Environmental Assessments (EA).

"What is the National Environmental Policy Act?", *available at* https://www.epa.gov/nepa/what- national-environmental-policy-act; *see also* 42 U.S.C. § 4332(C). This statute requires federal agencies to prepare detailed statements analyzing the impact of federal projects that significantly affect the environment.

NEPA further requires agencies to develop procedures to stay in compliance with it and requires that those procedures include identification of, and criteria for, a class of action which would not normally require an environmental impact statement or environmental assessment. 40 C.F.R. § 1507.3. This class of action is titled by the regulations as a "categorical exclusion." *Id*.; 40 C.F.R. § 1508.4. A categorical exclusion is:

> a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these [NEPA] regulations and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

40 C.F.R. § 1508.4. If, after analysis, it is determined that a proposed project will not have a significant effect on the environment and falls within the category of actions covered by the categorical exclusion regulation, 40 C.F.R. § 1508.4, a categorical exclusion document is issued summarizing the potential environmental impacts and the agency's conclusion. *Id.* If, however, the impact is too great, the project would require a higher level of NEPA clearance. *See generally* 42 U.S.C. § 4321, et seq.

### B.     § 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344

The Clean Water Act, § 404 "establishes a program to regulate the discharge of dredged or fill material into waters of the United States, including wetlands." EPA, *Permit Program under CWA Section 404*, https://www.epa.gov/cwa-404/section-404-permit-program; *see* 33 U.S.C. § 1344. Under § 404, a permit application must show that steps have been taken to avoid impacts to wetlands and that compensation will be provided for remaining unavoidable impacts. *See Permit Program under CWA Section 404.* When there are unavoidable impacts to wetlands,

a § 404 permittee can provide compensation through an in-lieu fee program. This program allows for the § 404 permittee to purchase compensatory mitigation credits to aid in the restoration, establishment, enhancement, and/or preservation of aquatic resources through funds paid to a Governmental or non-profit natural resources management entity. 33 C.F.R. §§ 332.1, 332.8.

### C. Project Requirements

On May 21, 2012, WLFHD issued a Request for Qualifications ("RFQ") for the project. Plaintiff submitted a statement of qualification for the project on June 11, 2012. Appx. 1, 33. The RFQ specifically stated that the purchase of wetland mitigation credits necessary to obtain a 404 permit would be part of the contractor's responsibilities on the project. Appx. 8. The RFQ also stated that a decision regarding NEPA had already been made, but that the responsibility for obtaining all permits, including environmental permits, would be part of the contractor's duties. *Id*.

After submission and review, on June 19, 2012, WLFHD issued a request for proposals ("Solicitation") to certain offerors, including the Plaintiff. Appx. 34, 36. The Solicitation included instructions to offerors, the solicitation provisions, contract clauses, a scope of work and revisions to standard specifications. *Id*. The Solicitation also provided various documents, including a July 2004 Waste Disposal Site Report ("Waste Site Report") and the Government's Categorical Exclusions document. Pl. Mot. 1.

The Solicitation stated that certain permits were required for the project, at the contractor's expense, including permits required by § 404 of The Clean Water Act, 33 U.S.C. § 1344. In particular, Section 5.1 of the scope of work required that the contractor perform all the necessary work to obtain permits and purchase any mitigation credits that might be required for the project. Appx. 40. Amendment A004, which was issued on July 19, 2012, modified Section 5.1, to clarify that the contractor was responsible for the purchase of mitigation credits and that it would not be reimbursed for such a purchase, specifically stating that "[t]he Design-Builder is responsible for purchasing mitigation credits, if necessary. FHWA will not directly reimburse the Design-Builder for the cost of mitigation credits and such costs should be included into the Offer price." Appx. 45, 50.

Section 5.3.2, titled "Permitting," further stated that the contractor was required to secure "all permits and clearances needed for completion of the project" including permits required pursuant to the Clean Water Act. Appx. 41. This section also stated that "[a] revised wetland delineation is likely to be required by the US Army Corps of Engineers to complete the 404 application . . . if required, mitigation credits will be required to be purchased[.]" *Id*.

Section 1.4 of the scope of work, titled "Historical Data Related to the Project," limited the reliability of the information provided to the bidders. It provided:

> In addition to the Physical Data provided in FAR Clause 52.236-4, Physical Data, there is information available from previous reviews, studies and preliminary engineering in the area of this Project. The information provided is for historical informational purposes only. The information does not

4

> necessarily represent current conditions or reflect requirements or conditions applicable to the present project. The information has not been checked for accuracy by FHWA. Offerors should not rely on the applicability or accuracy of this historical information in their responses to the Design-Build solicitations.

Appx. 39.

Certain clauses also exempted the Government from responsibility in the event the contractor interpreted or drew conclusions from the documents it provided with the Solicitation. Specifically, FAR Clause 52.236-4, Physical Data, listed several types of data and information, including categorical exclusions, that were furnished or referred to for informational purposes only. Appx. 37. In relevant part, the clause stated:

> Data and information furnished or referred to below is for the Contractor's information. The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the contractor. . . .
>     (d) The following data is available on our FTP site . . .
>         (7) Categorical Exclusion – May 2012.[3]

Appx. 37-38. Therefore, although the categorical exclusion was provided to the bidders with the Solicitation, FAR Clause 52.236-4 stated that the categorical exclusion was not to be relied upon and was given for informational purposes only.

Per NEPA, it was determined that the project would not have a significant effect on the environment. Therefore, a categorical exclusion document summarizing the potential environmental impacts and the agency's conclusion was issued. 40 C.F.R. § 1508.4. Mr. David Kennedy, FHWA's environmental specialist, prepared the categorical exclusions for the project. It stated:

> Material and waste sites are expected to be sourced at existing [Forest Service] quarries in the area as identified in the July 2004 Waste Disposal Sites Investigation Report. The sites identified in that report will serve as both material sources and waste sites and

---

[3] The Categorical Exclusion dated May 15, 2012 was amended on July 3, 2012 ("Amendment A002"). Collectively, the two are referred to as "the Categorical Exclusions." Amendment A002 to the contract modified the Physical Data clause, FAR 52.236-4 to add the amended categorical exclusion, revised in July 2012, to the physical data clause's list of data and information available to offerors. Appx. 44. Amendment A002 concerns the roadway corridor rather than the waste sites.

In addition, a supplemental amended Categorical Exclusion was also issued on April 16, 2013, Appx. 66, but it was after Plaintiff recognized there were wetlands in the waste disposal areas identified in the Waste Site Report, and, after Plaintiff submitted its first request for equitable adjustment. It is, therefore, not relevant to this case.

5

> are included in this analysis of environmental resource impacts. No further analysis of the environmental impacts of using these sites for material and wasting is necessary at the sites identified in the report unless an expansion of a site is proposed.

Appx. 61. Thus, the categorical exclusion referred to the Waste Site Report and the waste sites were included in Mr. Kennedy's analysis of the environmental resource impacts. *Id*.

The Waste Site Report was also provided with the Solicitation, and it identified sites which could be used for the disposal of waste materials associated with the project. Appx. 82-96. It described the specific location of the previously used quarries and clear-cut areas, their dimensions and boundaries, the quality and quantity of rock, and estimates of their capacity to be used as waste sites. *Id*. The Waste Site Report did not identify or discuss any wetlands within the boundaries of those specific waste sites. Kennedy Depo. at 47:14-48:15; 30:21-32:6; 34:6-24; Stewart Decl., Ex. 3 (Depo. Ex. 4). The Waste Site Report was not created for this specific project but rather for a previous highway project in the Tongass National Forest. Appx. 82. The contractor for the Forest Service who drafted the report did not perform a wetland delineation of the sites and the report does not indicate that a wetland delineation was performed. *See generally,* Appx. 82-96.

The Solicitation also contained revisions to standard specifications ("RSS"). Relevant here are RSS §105.02(c) and RSS § 105.06. In pertinent part, RSS §105.02(c) stated:

> **(c) Government-identified sources**. Potential material sources are listed in the *Waste Disposal Sites Investigation Report*. These sites have received NEPA clearance. No further analysis of the environmental impacts of using these sites unless an expansion of a site is proposed. If expansion is proposed, the requirements of Subsection 105.02(b) will apply.

Appx. 43 (bold and italic in original).

In addition, RSS § 105.06 Disposal Sites provided:

> Waste and excess material may be disposed at the sites listed in the Waste Disposal Sites Investigation Report. The sites have received NEPA clearance. No further analysis of the environmental impacts of using these sites is needed unless an expansion of a site is proposed. If expansion is proposed, the requirements of Subsection 105.02(b) will apply. Obtain approval from the U.S. Forest Service before using these sites.
>
> If material is disposed of at other areas off the project, comply with Subsection 105.02 as well as any applicable local, state and federal laws.

*Id*.

Prior to submitting its bid, Plaintiff made a 2-day site visit.  Pl. Br. 9.  Thereafter, Plaintiff submitted its proposal on July 24, 2012, at a total pre-construction bid of approximately $41.6 million.  *Id.*  Plaintiff's bid included $1,000,000 in mitigation fees for the approximately 40 acres of wetlands along the roadway corridor.[4]  *Id.*  Plaintiff's fixed price bid did not include wetland mitigation fees for construction activities in the waste areas.  *Id.*

Plaintiff was awarded the contract on August 2, 2012.  *Id.*  The Federal Acquisition Regulations, Transportation Acquisition Regulations, scope of work, revisions to standard specifications, and the contractor's accepted proposal collectively formed the contract documents.  Appx. 42.

### D. Plaintiff Requests an Equitable Adjustment

In the fall of 2012, Plaintiff became aware that there were wetlands in the designated waste areas.  Dunbar Depo. at 48:22-50:8.  As a result, it became apparent to Plaintiff that it would need to pay additional mitigation fees for the waste site wetlands.  Consequently, on March 7, 2013, Plaintiff wrote a letter to the project manager, Jane Traffalis, requesting an equitable adjustment in the amount of $484,905, for its prospective purchase of mitigation credits in order to obtain a § 404 permit due to wetlands in the waste areas ("Serial Letter #19").  Appx. 99.  In that letter, Plaintiff argued that, according to the contract documents, it was not required to pay for mitigation credits for wetlands in the waste disposal areas; therefore, the additional cost constituted a compensable change to the contract.  *Id.*

On June 24, 2013, Plaintiff revised its requested amount to $565,875, based upon actual amounts paid for wetland mitigation credits pertaining to the sites identified by the Waste Site Report ("Serial letter #35").  Appx. 101

On February 10, 2014, approximately one year after Plaintiff first wrote to the project manager, Plaintiff's request was denied.  Appx. 106.  In reaching her decision, Ms. Traffalis explained that although Plaintiff had alleged the presence of wetlands in the waste disposal area was a change to the contract, Plaintiff's request was more properly evaluated pursuant to the differing site conditions clause.  *Id.*  Evaluating the request under this standard, she ultimately concluded that the contract did not represent that there would not be wetlands in the waste disposal areas, and that had Plaintiff conducted a reasonable site investigation, the investigation would have revealed the presence of wetlands.  *Id.*  However, Ms. Traffalis also evaluated the request under the constructive change theory and concluded that Plaintiff was not entitled an equitable adjustment under that theory because the contract required the contractor to purchase all wetland mitigation credits associated with the project.  Appx. 107.

On June 3, 2014, Plaintiff responded to the February 10, 2014 denial letter ("Serial Letter #55").  Appx. 109.  Plaintiff argued that it had relied on the representations in the bid documents

---

[4] Although Plaintiff's bid included approximately $1,000,000 to cover wetland mitigation fees, Plaintiff ended up only spending approximately $895,407 on its purchase of wetland mitigation credits, including the purchase of credits for the project corridor and the waste disposal areas.  Appx. 104.

7

to conclude that no wetland delineation and the ensuring purchase of wetland mitigation credits would be required for the sites identified in the Waste Site Report. *Id.* The letter stated that "[b]y any contractual and equitable analysis, the additional wetland mitigation cost incurred by KIWC because of the presence of wetlands in the provided waste disposal sites is a compensable Change." *Id.* at ¶ 1. Additionally, Plaintiff countered Ms. Traffalis' reasonable site investigation analysis by asserting that "KIWC invested two complete days on a site investigation trip, which is unquestionably a reasonable investigation." *Id.*

On June 30, 2014, Ms. Traffalis again denied Plaintiff's request for an equitable adjustment. Appx. 111. The denial letter stated "[i]t is FHWA's conclusion that the situation does not constitute a change to the contract, nor is it a differing site condition." *Id.*

On August 19, 2014, Plaintiff submitted a certified claim to WFLHD, seeking $490,387.40 in compensation for the mitigation credits involving wetlands in the waste disposal areas (and associated expenses) and citing its June 3, 2014 letter (Serial Letter #55) as the basis for its claim. Appx. 112. Plaintiff did not reference, either in Serial Letter #55 or in its certified claim, an alleged differing site condition. *Id.* Instead, Plaintiff specifically stated in the referenced Serial Letter #55 that "[b]y any contractual and equitable analysis, the additional wetland mitigation cost incurred by KIWC because of the presence of wetlands in the provided waste disposal sites is a compensable Change." *Id.* at ¶ 1.

On January 15, 2015, the contracting officer, Elizabeth Firestone, issued her Final Decision denying Plaintiff's claim. The contracting officer's analysis began with the statement "it is assumed [Kiewit] maintain[s] the purchase of credits constituted a constructive change to the Contract." Appx. 118, ¶ 1. The contracting officer then held that "neither the presence of wetlands in the sites nor Kiewit's purchase of wetlands credits were a constructive change to the contract," and denied Plaintiff's claim. Appx. 119. The decision did not address any purported or potential differing site conditions claim. *See generally*, Appx. 113-120.

## II. Standard of Review

The Government moves for the dismissal of Plaintiff's claim on two bases: (1) RCFC 12(b)(1), lack of subject matter jurisdiction; and (2) RCFC 56(c), summary judgment where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.

A plaintiff bears the burden of establishing the Court's subject matter jurisdiction by a preponderance of the evidence when jurisdiction is challenged pursuant to Rule 12(b)(1). *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). In considering a motion to dismiss, the Court accepts as true the complaint's undisputed allegations of fact and construes the facts in the light most favorable to the plaintiff. *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989). If this Court's jurisdiction is challenged, the plaintiff cannot rely merely upon allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936). The Court may look at evidence outside of the pleadings in order to determine its jurisdiction over a case. *See Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir.

2011). Should the plaintiff fail to establish subject matter jurisdiction by a preponderance of the evidence, *Banks v. United States*, 741 F.3d 1268, 1278 (Fed. Cir. 2014) (citation omitted), the Court "must dismiss the action." RCFC 12(h)(3).

Subject matter jurisdiction may be addressed at any point in the proceedings. *Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993); *see also United States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 998 n.1 (Fed. Cir. 1991). "If the court determines at *any* time that it lacks subject matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3) (emphasis added).

RCFC 56(c) provides for summary judgment if it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has defined a genuine issue over a "material fact" as a dispute "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The mere existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48. The moving party bears the initial burden of proof, but this burden may be discharged if an absence of evidence supporting the opposing party's claim is demonstrated. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The party opposing summary judgment carries the burden of showing a genuine issue of material fact in dispute. *See id.* at 324.

### III. Discussion

#### A. Defendant's Motion to Dismiss Count II for Lack of Subject Matter Jurisdiction

Defendant moves to dismiss Plaintiff's differing site condition claim regarding the presence of wetlands in the waste disposal area because Plaintiff failed to present this issue in its certified claim to the contracting officer. Plaintiff argues that this Court may exercise jurisdiction over Count II of its complaint despite the fact that Plaintiff never definitely raised a differing site claim to the contracting officer.

In order to properly raise a claim under the CDA, a plaintiff must submit "in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (quoting *Contract Cleaning Maint., Inc. v. United States*, 811 F.3d 586, 592 (Fed. Cir. 1987)). Because the "requirements of the CDA are jurisdictional prerequisites to any appeal," the contractor must have submitted a proper claim and must have received the contracting officer's final decision on that claim in order for this Court to have jurisdiction. *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010). Thus, an action brought before the Court of Federal Claims under the CDA must be "based on the same claim previously presented to and denied by the contracting officer." *Scott Timber*, 333 F.3d at 1365 (quoting *Cerberonics, Inc. v. United States,* 13 Cl. Ct. 415, 417 (1987); 41 U.S.C. § 605(a) (2000)). "This standard, however, does not require ridged adherence to the exact language or structure of the original administrative CDA claim." *Scott Timber*, 333 F.3d at

1365. Thus, even though claims may be styled differently, the Court may determine that they are the same if they "arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." *Id*.

In its certified claim, Plaintiff referred to Serial Letter #55 as its basis for compensation. Appx. 112. The certified claim itself neither referenced a differing site condition nor a constructive change to the contract. Appx. 112. Serial Letter #55 alleges that additional wetland mitigation permit cost was a "compensable Change," but makes no mention of a differing site condition. Appx. 109–110. The only time a differing site condition was raised was by Jane Traffalis, the project manager, notifying the Plaintiff that if it had any claim, it would be pursuant to the differing site condition clause rather than the changes clause. She subsequently denied both claims.

In its reply brief, Plaintiff argues that its certified claim incorporated the previous correspondence between the project manager, Jane Traffalis, and Plaintiff. To support this contention, Plaintiff directs the Court to a sentence in its certified claim that it quotes as stating "[t]he basis of our request . . . is as outlined in our [previous correspondence.]" Pl. Reply 4. According to Plaintiff, the issue was thus properly presented to the contracting officer.

Plaintiff's addition of the bracketed alteration is disingenuous. That is, the certified claim actually stated: "The basis for our request for additional compensation is as outlined in our Serial Letter #55 dated June 3, 2014." Appx. 112. Serial letter #55 makes no reference to a differing site condition. Nor does the certified claim, as Plaintiff suggests, refer to the previous letters written to the project manager. *See* Appx. 112. Consequently, the contracting officer did not address a potential differing site condition claim in her final decision because Plaintiff did not raise the issue in its certified claim. Instead, the contracting officer "assumed [Kiewit] maintain[s] the purchase of credits constituted a constructive change to the Contract," Appx. 118, ¶ 1, and held that "neither the presence of wetlands in the sites nor Kiewit's purchase of wetlands credits were a constructive change to the contract." Appx. 119.

The Court may, however, hold that the claim is properly presented if it finds that the differing site condition claim arises from the same set of operative facts as the constructive change claim such that the two claims can be considered the same. *Scott Timber*, 333 F.3d at 1365. The Defendant argues that the two claims are not the same. In support, the Defendant states:

> [T]he operative facts necessary to maintain a differing site conditions claim . . . focus on the Contract's description of the work site." *Kiewit Const. Co. v. United States*, 56 Fed. Cl. 414, 420 (2003). In comparison, "[a] constructive change occurs 'where a contractor performs work beyond the contract requirements, without a formal order under the Changes Clause.'" *M.A. DeAtley Constr., Inc. v. United States*, 75 Fed. Cl. 575, 581 (2007) (citing *Navcom Def. Elecs., Inc. v. England*, 53 Fed. App'x 897, 900 (Fed. Cir. 2002)).

> As such, to consider Kiewit's differing site condition claim, the Court would need to examine whether the contract made an affirmative representation as to the site conditions as pertaining to wetlands, whether the actual site conditions were reasonably foreseeable, and whether the actual site conditions materially differed from those represented in the contract documents. *See Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348-49 (Fed. Cir. 2008). In contrast, to consider the constructive change claim, the Court would need to consider whether the contract documents encompassed the responsibility to purchase mitigation credits for wetlands in the waste disposal areas, and whether Kiewit performed work beyond the contract requirements without a formal order. *See Int'l Data Products Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007).

Def. Br. 17.

In this case, however, the facts fit both claims—that is, they support both a differing site conditions claims and changes clause claim. For instance, Plaintiff has consistently asserted that it believed it was entitled to an equitable adjustment for mitigation costs incurred in connection with wetlands located in the waste sites. Plaintiff has relied on both the contract documents and its 2-day site visit to support its claims. Moreover, Plaintiff, seeks the same remedy it sought from the contracting officer, namely an equitable adjustment for those mitigation costs. Plaintiff may now have posed slightly different legal theories for the equitable adjustment, but Plaintiff's claims are essentially the same as presented to the contracting officer. In this regard, Plaintiff's claims would not "subvert the statutory purpose of requiring contractors first to submit their claims to the [CO]" to allow the CO to receive and pass judgment on the contractor's entire claim. *Scott Timber*, 333 F.3d at 1365 (quoting *Croman v. United States,* 44 Fed. Cl. 796, 801–02 (1999)). Therefore, the Court holds that the two claims are the same and merely assert differing legal theories for recovery. Accordingly, the Court denies Defendant's Motion to Dismiss Count II.[5]

## B. Summary Judgment Motions

### 1. Differing Site Conditions

---

[5] Plaintiff further argues that a contracting officer's failure to issue a decision on a specific claim constitutes a deemed denial of that claim. Pl. Reply Br. at 3 n.1. Thus, according to the Plaintiff, because the contracting officer failed to issue a decision on its differing site claim, that the claim is deemed denied. Pl. Reply Br. at 3 n.1. However, under 41 U.S.C. § 7103, a contractor must have actually submitted a certified claim in order for the contracting officer's failure to timely issue a decision to be deemed a denial. *See* 41 U.S.C §7103(f)(5). As explained above, Plaintiff never submitted a certified claim for an alleged differing site condition. As such, the contracting officer's failure to issue a final decision on that claim is not a deemed denial.

The Contract Documents included the Differing Site Conditions clause, FAR 52.243-4. Stewart Decl., Ex. 19 at C-84. Such clauses are intended to provide the Government "with more accurate bids by discouraging inflation for risks that may not occur." *Hardwick Bros. Co. v. United States*, 36 Fed. Cl. 347, 405 (1996). They are intended to "ease the contractor's burden of risk assessment and site investigation." *Id.* Differing site conditions (Type I) arise where "subsurface or latent physical conditions at the site . . . differ materially from those indicated in the contract."[6] *Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696, 703 (2007).

To recover on a differing site condition claim, the contractor must prove that: (1) the conditions indicated in the contract differ materially from those actually encountered during performance; (2) the conditions encountered were reasonably unforeseeable based on all the information available to the contractor at the time of bidding; (3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and (4) the contractor was damaged as a result of the material variation between expected and encountered conditions. *Int'l Tech Corp.,* 523 F.3d at 1348-49. The standard is how a reasonably prudent contractor would interpret the contract documents. *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998). Further, the contractual representation must also be affirmative. *See Comtrol, Inc. v. United States*, 294 F.3d 1357, 1363 (Fed. Cir. 2002). And finally, "[w]here the Government has provided misleading information to a contractor, the Government is not relieved from liability by general contractual provisions requiring the bidder to investigate the site or satisfy himself of conditions, or stating that the United States does not guarantee the statements of fact in the specifications, etc." *Baldi Bros. Constructors v. United States*, 50 Fed. Cl. 74, 79 (2001); *accord Flippin Materials Co. v. United States*, 312 F.2d 408, 413 (Ct. Cl. 1963) (collecting cases).

Here, it is the Plaintiff's contention that the Government included misleading provisions in the contract documents which reasonably led it to believe that wetlands were not present at the waste sites. Plaintiff argues that it relied on "the affirmative representations in the Categorical Exclusions, Waste Site Report and RSS sections 105.02(c) and 105.06." Pl. Br. 18-19. Relying on RSS § 105.06, Plaintiff argues that the language "no further analysis of the environmental impacts of using the designated sites is necessary unless expansion of the sites is proposed," means that wetland delineation pursuant to Section 404 of the Clean Water Act was only required where an expansion of the designated sites was proposed in accordance with RSS § 105.02(b). Plaintiff argues that the interpretation is consistent with and is supported by the Categorical Exclusions, which state that no further analysis is needed for sites identified in the Waste Site Report. As the waste sites were identified in the Waste Site Report, Plaintiff understood these documents to mean that it need not analyze or further concern itself with environmental impacts of these waste sites, including wetland mitigation credits related to the waste sites.

On the other hand, the Defendant argues that neither the waste disposal sites report nor the categorical exclusions are part of the contract. Def. Br. 21. Thus, it is the Defendant's position that these documents should not be considered by the Court in making its determination as to whether the contract documents contained an affirmative representation that there were no wetlands in the waste disposal areas identified in the Waste Site Report. *Id*. But the Court does

---

[6] Neither party argues that this would not be a Type I differing site condition claim.

12

not have to decide whether the Categorical Exclusions or the Waste Site Report were part of the contract, since, even if these documents are considered part of the contract, the Court's decision would be the same.[7]

The resolution of this dispute comes down to the meaning of "environmental impacts," a phrase used in the Categorical Exclusions and in RSS §§ 105.02(c) and 105.06.[8] Reading the Categorical Exclusions, a reasonably prudent contractor would conclude that no further analysis was necessary regarding *any* environmental issues, that is, including ones arising under the CWA. But this conclusion is unsustainable when the Categorical Exclusions are read in the context of the contract as a whole. Unlike the Categorical Exclusions, RSS §§ 105.02(c) and 105.06 contain a reference to NEPA. Reading these provisions, a reasonably prudent contractor would conclude that no further analysis was needed as to *NEPA* environmental impacts. Looking at the Categorical Exclusions and the RSS sections together, the inconsistency between the unlimited meaning of "environmental impacts" in the Categorical Exclusions and the limited meaning of the phrase in the RSS sections is apparent. At the least, this inconsistency in the use of "environmental impacts" should have put a reasonably prudent contractor on notice of inquiry. The contractor was aware that both NEPA and the CWA were at play because of the reference to both in the contract.[9] In addition, the rules of contract interpretation provide that the specific should prevail over the general.[10] Finally, this inconsistency is something that a sophisticated contractor like Plaintiff should not have missed. Therefore, the Court cannot accept Plaintiff's reasoning under its Differing Site Conditions claim.

### 2. Constructive Change

The Contract Documents included the Changes Clause, FAR 52.234-4. Stewart Decl., Ex. 19 (FHWA00000145 - 147). A constructive change occurs where a contractor performs work beyond the contract requirements. *Int'l Data Products Corp*, 492 F.3d 1317, 1325. When the contractor merely performs in compliance with the contract specifications, there is no constructive change to the contract. *NavCom Def. Elecs., Inc.*, 53 Fed. App'x 897, 900 (Fed. Cir. 2002). Again, Plaintiff alleges that a constructive change to the contract occurred when it was required to pay for mitigation credits in the waste disposal sites. Plaintiff argues that when the contract documents are taken as a whole, the only reasonable interpretation is that no wetlands were expected to be encountered within the waste disposal sites and, therefore, no environmental analysis or payment of mitigation credits was expected to be required for the designated waste sites. According to Plaintiff, when considered together, the only reasonable interpretation of

---

[7] Therefore, when the Court refers to the "contract," it includes the provisions used in Plaintiff's argument.

[8] Neither party disputes the content of the Waste Site Report.

[9] Section 5.3.2 expressly refers to "the Clean Water Act," and section 5.1 expressly refers to purchasing "wetland mitigation credits."

[10] This principle applies equally to the Defendant. The sweeping disclaimer of FAR 52.236-4 cannot vitiate further specific provisions which imply that a reasonably prudent contractor may rely on them. *Travelers Cas. & Sur. Co. of Am.*, 75 Fed. Cl. at 714.

these documents is that the bidder would only encounter wetlands (and to incur the cost of mitigation fees) for the approximately 40 acres of wetlands anticipated in the roadway corridor.

Again, relying on RSS § 105.06, Plaintiff argues that the language "no further analysis of the environmental impacts of using the designated sites is necessary unless expansion of the sites is proposed," means that wetland delineation pursuant to Section 404 of the Clean Water Act was only required where an expansion of the designated sites was proposed in accordance with RSS § 105.02(b). On the other hand, Defendant argues that Amendment 004 squarely places the responsibility on the contractor to pay for all wetland mitigation credits. Defendant contends that there is no language in the contract carving out an exception for wetlands in the waste disposal areas, nor is there any language in the contract which states that no wetlands exist in those areas. According to the Government, because the contract language is unambiguous on its face and Plaintiff only performed in accordance with the contract's explicit requirements, the Court's inquiry should end here. Def. Mot. at 30 (citing *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002)).

Defendant pushes the broad language it quotes too far, as does Plaintiff in its failure to account for the more specific references to "environmental impacts." Neither really looks at the contract as a whole. As with the claim based on differing site conditions, the specific provisions of RSS §§ 105.02(c) and 105.06 give further meaning to the unconditional statement in the Categorical Exclusions. Plaintiff was justified in not inquiring further concerning environmental impacts of the NEPA type; it was not justified in not inquiring further concerning environmental impacts under the CWA. Therefore, the Court cannot accept Plaintiff's reasoning under its Constructive Change claim.

### IV. Conclusion

For the reasons set forth below, the Court **DENIES** Plaintiff's Motion for Summary Judgment. The Court further **DENIES** Defendant's Partial Motion to Dismiss and **GRANTS** Defendant's Cross-Motion for Summary Judgment. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge